Good morning, Your Honors. My name is Chris Lee. I represent Appellant NetCurrents Information Services, Inc. May it please the Court, District Court's grant of summary judgment of non-infringement should be set aside for two independent reasons. First, the ruling was based on two erroneous claim constructions. Second, even if this Court were to affirm what we believe to be erroneous claim constructions, NetCurrents believe that District Court simply ignored the documentary and testimonial admissions made by Dow Jones regarding the accused systems. Instead, District Court simply adopted nearly verbatim conclusory and unsupported statements made in a declaration by a consultant of Dow Jones in this case, even though those statements were directly contradicted by Dow Jones' own admissions in his documents and sworn testimony of his employees. Now, turning to the legal error, the first legal error took place with respect to the District Court's claim construction of the term real-time. In some way, District Court's construction of the term real-time in this case really reflects the concern that Judge Bryson, in an en banc decision in Phillips, expressed about allowing for the District Court's misapplication of textless digital by utilizing dictionary definitions and court's own interpretation or own understanding of the terms that District Court, at least in this case, thought had one meaning and had a plain and ordinary meaning that did not depend on any of the context in which the term is used. And as Mr. Fanek, Dow Jones' own employee, testified in this case, in fact, he's the gentleman who was involved in the designing of the accused system, he testified that as a person skilled in the art, the term real-time is one of those terms that could have 12 different meanings. It all depends on the context, context in which the term is used. Doesn't that run the risk of making the term too indefinite to be enforceable? No, Your Honor. And that's an issue that was raised in Dow Jones' reply brief. We did not have a chance to address that before the court below, and we have addressed that in our brief. But the answer is no, because if you were to look at the term real-time in the context of this invention, which is providing alerts based on user-specified terms for the websites that user wishes to monitor in this case, this is all being done in the context of the Internet dynamic data exchanges. And if you were to look at the abstract of the invention, summary of the invention, it talks about the fact that to overcome the problems that existed in the prior art, and that problem is discussed in the background of the invention section of the patent, column one of both patents, the problem that existed was that if you were to go back to 98, 99, when this application was filed, information was being exchanged dynamically in ways that had not been done before. And search engines that existed back then, such as AltaVista, Hotbots, Lycos, or Yahoo, as it existed 10 years ago, relied on very static proprietary databases that are updated very infrequently. And those existing systems did not allow the problems that inventors in this case... So if those databases were updated every week, and it was swept once a week, would that be real-time at that point? In the context of this invention, no, Your Honor. And I think the background of the invention talks about really the bookend of the range. And the invention talks about... Background of the invention talks about that the data exchange in the context of this Internet applications is really done on a quote-unquote daily basis. And so it's our position that to the extent that there has to be a bookend, it is really that you have, at one extreme, instantaneous, which we submit to you for the reasons we state in our brief, is not supported by the intrinsic evidence. And then the other bookend is really on a daily basis. It has to be updated and accessed and scanned at least on a daily basis. So what does that mean, 24 hours, every 24 hours would be real-time, pursuant to the background of the invention? Yes, at least in the context of this patent, yes. Well, when someone reads it, we start referring to real-time. Real-time to me could be instantaneously, or it could be 5-minute delay, 10-minute delay, 15-minute delay. How am I supposed to interpret the term real-time within the written description of the invention? You're saying that the written description forces you to determine it to be daily? Yes, Your Honor. In fact, I think you are correct in that the term real-time, as Mr. Fanek of Dow Jones testified, has many meanings. And it really depends on the context. And district court is a lay judge, not a person skilled in the art. I'm not one.  That's right, Your Honor. We can read the terms of the patent. Now, a person reading the patent itself, the written description and the claims, would you necessarily be forced to determine whether it's 24 hours as one of the ends, one of the terminal data points, or 5 seconds or 10 seconds or 24 seconds? I think the... I'm sorry, Your Honor. No, no. Within that parameter of actual time with no delay could be real-time? That's correct, Your Honor. Or as you're saying, could be 24 hours? I think the 24-hour would be the absolute, the bookend. How would we know that? I think the patent talks about that. What is it in the claims that tells us that? Well, claim talks about, obviously, real-time in context of both patents, 041 and 141. And background of the invention does talk about the information takes place on a daily basis. But taking place on a daily basis is not necessarily examining the evidence every day or once a day. It could be continuously throughout the day. That would be, if it was done every day, that would be a daily basis. Well, Your Honor... In other words, it seems to me that this statement here, that the search entities generally maintain the databases on a daily basis, doesn't answer the question of what real-time means. It could be that the examination is conducted constantly through the course of the day, and this is done every day. Your Honor, there are really two components to that question. First component, I would answer that to the extent that the data examination or the obtaining of data retrieval is done within five seconds instantaneously, that certainly fits within the confines of the claim scope. Now, in terms of whether the data exchange taking place on a daily basis means continuous or constant, we don't believe that's what the inventors intended. What they talked about was information is taking place on a daily basis, as is this court's website is updated on a daily basis. It's updated about 1 o'clock, 12 o'clock every day. I take it to mean it's being done once a day. Would you consider that real-time? Well, I think it depends on the circumstances, but I believe it does within the confines of this patent. Do I understand correctly that your claim construction of real-time  That's correct, Your Honor. Some events might not become obsolete for days or months? That's right. And so real-time could go on for days or months? Not in the context of these patents, no. It's because I think inventors... So that isn't your claim construction? And I think in the context of the claims of these patents, our construction was that the system should be able to react to events in a timely manner, timely manner before the events become obsolete. In the context of the Internet communications... If I want to design around your patent, how would I go about figuring out what you really mean? Maybe two days, three days' access on a periodic basis. But how would we know that from the written description? How would we know that that's the proper measure of the scope of coverage so that if we wanted to avoid infringement, we could design around? I think two things. Number one, again, I go back to the background of the invention. It talks about what the problem was with the existing Internet search engines that existed back in 98, 99 timeframe. Well, you referred in the background to the daily basis... That's right. That is correct. ...which would suggest that, well, if I don't look at the data more than... or if I don't look at the data more than once every other day, then I'm free. I don't have to worry about infringement. At least... Would that be a safe conclusion? That every other day would be a safe? Yeah. I think that that much, I think I'm willing to concede that, yes, Your Honor. So you're willing to concede it, but we'd have to litigate it in order to find out what you're willing to concede? No, I mean, Your Honor, I think the patent does talk about, and to a person skilled in the art, and we presented the declaration from the inventor on this issue, as well as the disclosure from the patent itself. Well, I looked for it, and I want to be sure I didn't miss it. You did not avail... The applicant did not avail itself of the opportunity to define the term real-time in the patent. Am I correct? Is that so? In the patent itself?  I think the answer is not expressly, Your Honor. What about column three, lines 59 through 62? It seems to be referring to an embodiment, but nonetheless says in this embodiment, the sequential accessing process is performed at or near the maximum processing speed permitted by the system, so as to affect monitoring in real time. That seems to suggest that at least for the so-called first embodiment, that real-time means performed at or near the maximum processing speed. I think that's an embodiment that the inventor talked about, in that that talks about not the periodic nature of the access in the resource locations, but what it does talk about is that the system should be capable of going out there, and when it does go out to remote locations to get the information, that has to be done in a way that it is fast enough. I don't know if that answers your question. Well, it seems to me that this sentence is not so narrow, that this is talking about what is meant by real-time. I think that means going out and getting the information in effect without delay, which is a commonly understood meaning for real-time. It's obtaining information without any sort of intentional delay, and that seems to be exactly what is stated here. There isn't a whole lot of guidance provided in this specification, but that does seem to be some guidance and some support, certainly, for the district court's conclusion. We respectfully disagree on that, Your Honor, and the reason is to a person skilled in the art reading this patent as a whole. As this court has said, looking at the background of the invention and looking at the periodic nature of having to access websites, remote websites that are not controlled by the accused systems, it talks about information taking place on a daily basis, and I think it's reasonable, and I think we have stated to the district court, that accessing of the information should be done at least as frequently as the rate at which information is updated. I mean, if you were interested, for example, in keeping track of the stock price of some stock, now that stock price is going to be changing almost continuously through the course of the day, and buying or selling decisions are going to be based upon that stock price as it varies and as it's seen at any particular moment. So looking at the stock price once a day is not going to do you much good if you're interested in making an informed decision on that stock. Judge, I would agree with that statement. Again, getting instantaneous stock quotes for the purpose of making trades requires, in that context, very fast alert or the response. This patent is not so limited in our view in that it talks about the Internet data exchange, information that's out at third-party websites. So, Mr. Lee, what you're saying basically is that the real-time factor, the rule would be from instantaneous for one of the embodiments to daily for the outside point of reference? Your Honor, we don't believe it really supports instantaneous, but I think it comes fairly close to that. There would be one bookend, and the other bookend would be essentially on a daily basis for 24 hours. Thank you, Mr. Lee. You're well into your rebuttal time, so we'll add three minutes to your time for rebuttal. Thank you, Your Honor. Mr. Naboto, we'll add three minutes to your time if you need it. Thank you, Your Honor. Don't feel obligated to use that. I won't. Thank you. Well, I think in reviewing the undisputed facts of this case, two points become clear. First is, there really is not a single definition of real-time which, when read in context, supports NetCurrent's position in this case. And second, there's not a single fact which, when read in context, indicates that the accused factiva products operate as a real-time system in the context of those definitions. I think, as the Court's questions illustrate, real-time definitely has a common and ordinary meaning, and it had that meaning at the time of the invention and the time of the patent. And in looking at dictionary definitions in this case, which were simply a form of context, I think the District Court looked at a series of dictionary definitions. NetCurrent did not really come up with a dictionary definition that, when read in completeness, supported its position. And the examples of real-time that came out of either the common and ordinary use or of the definitions that were found are real-time court reporting, real-time stop quotes, real-time traffic reports, airline collision avoidance systems, aircraft guidance systems, transaction processing systems, flight simulators, missile guidance systems, and radar systems. And arguments in courts of appeals. Exactly. That's not real-time. And none of those would be considered real-time if you waited a day. If we were in a court and an objection was made and a judge asked the reporter, I'm going to rule on the objection, I'll look at the question, and it took a day for the stenographer's question to come up on his computer screen, no one would think that was real-time. They wouldn't think it was real-time if it was anything more than seconds or, potentially in certain cases, minutes. But that's really the context of real-time. It's true of the stop quotes issue. It's true of really anything. And that's what, in reaching his analysis, Judge Walter, I think, relied upon. And so even if there's a range, because the quote is offered that there's a range and there may be different real-times for different situations, it's always going to be somewhere in the seconds or minutes range. The daily basis, the quote, I think, Judge Lynn, your question was a good one, because saying something is on a daily basis means it's frequent. It doesn't mean that you must have an interval of a day. And the real-time word really does not get interpreted that way, even with that one statement in the background of the invention.  Sure. He didn't quite get into that, but if I understand the tracking side, your methodology is to look at a large array of websites, gather the information, and then forward it to clients who have a particular interest in a particular issue. Is that correct? Exactly. Do I understand that correctly? Your Honor, there are really two very different purposes between the Factiva system and the claims of the invention and the patent. The Factiva system basically goes out, and the purpose of Factiva is to generate an electronic library or database, something that will be available, it is sent to archive eventually, and it becomes a way for users of Factiva to do research and analysis and have a storehouse of information. And so when Factiva goes out to websites, it is really looking for all new information that's out in the different websites. It basically goes to websites of its own choosing. It chooses about 10,000 websites. If a particular user says, gee, I'd really love you to go to this website, that's not going to affect Factiva. Factiva picks the websites that it thinks will generate the best library and database. It goes out, and it brings in all the information. In contrast, the patented invention was very concerned about going out and getting information in a very, very speedy way, very targeted information. The purpose of the patent invention was to stop stock manipulation and rumors, and so if a user of the patented invention was concerned about a particular stock, the user would say, I'm interested in these websites, and would specify them. There may not be websites that Factiva would even search, but they would say, I'm interested in these websites, and I want to know information about this particular stock. And basically the invention was to go out in a very laser-like fashion and just evaluate, is there any new information that relates to the client's search terms out in the particular websites the client asked to be searched. And so whereas Factiva brings all the information in, the only information that would be brought in in the patented invention is this information that is directly responsive to the client's search questions. And in fact, in obtaining the patent, the patentees actually distinguished, in distinguishing in the Freibold reference, basically they said, Freibold is different from us. It indiscriminately detects changes in websites and brings everything into the system. And we, in contrast, are surgically just going out and doing something different. We're going out and just orienting ourselves to client search terms. And that is what the tracking index term of the patent relates to. And basically the patent describes a system of just going out in that surgical way. And that's part of the reason that the patented invention was supposed to achieve real-time searching, because it wasn't going out and bringing in everything. I can understand why a client might like his product. Why would a client like yours? A client would have different objectives in using the Factiva system. The Factiva system is a comprehensive, creates a comprehensive archive. It brings in lots of different information. If you're looking for particular focused information on a very fast, real-time basis, there are other products. In fact, Dow Jones offers different products in terms of real-time data feeds and so forth. They're not part of this case. This case is about real-time internet searching. And Factiva really doesn't do that, because the undisputed facts indicate that at most, it's basically 99% of the sites that are being visited are being visited roughly once a day. And there's a small handful of sites, less than 1%, that are visited every three hours for half the day and then not visited at all for the other half of the day. And so it's a different, you know, basically different objectives. But Factiva could be an instantaneous type of a search system, too, couldn't it? There's no restriction that it be a three-hour cycle. The way the product is designed, basically it simply goes out and the timing of the searching is such that most websites, over 99%, are searched once a day. And there are six websites, less than 1%, that are searched every three hours. So that could be considered real-time as far as Factiva is concerned? As far as Factiva, our company, is concerned? Well, we don't consider that to be real-time internet searching. I guess, in other words, Factiva, you know, in terms of the... Remember that there are different components of the material that we bring into our database. We bring in news feeds and licensed content, which is the bulk of what we use. And then we do internet searching, which is a smaller part of what we do. And actually, this case is only relating to the internet component of that aspect. But I think Factiva, in terms of the term real-time, would not consider anything that it's doing to be real-time. Now, technically, you could. I think, is that your question? Technically, he could run real-time, couldn't he? That's right. The question is whether there's the capacity? You could operate it on a real-time basis. Now, hypothetically, if we construe real-time to mean instantaneous actual real-time up to daily searches, would that capture and identify the Factiva process? Because of our internet searching, we search 99% of our references about one time a day. And so if the court's construction was that searching internet references one time a day would constitute real-time, then in terms of the real-time limitation, that would be real-time. That would capture the... I mean, in terms of the real-time. There would be other aspects of non-infringement and so forth. We understand that. But the real-time is in each one of the claims of the patents. Right. Yes, that's correct. So basically, if that one does cover your particular process, hypothetically, there'd be other aspects of the claims which you would challenge. That's right. I mean, I think there would be other bases for non-infringement and validity, clearly, as well. Because, in fact, it was specifically the narrower definition of real-time, the much more focused sort of seconds or minutes type of real-time, that was the basis. What happened to the validity issue? It got put aside? Yes. The court reserved it, basically. I mean, they denied it without prejudice in light of the grant of summary judgment on non-infringement. There was a written description that Column 1, Lines 50 to 54, refers to the server causing the periodic access of each resource location to determine whether any information on a particular resource has been added that's pertinent to the desired search term since the previous visit to the location. That certainly suggests that an examination of the data on a real-time basis takes place from time to time, not necessarily in actual time or not necessarily instantaneous, but every so often, periodically, which seems to be quite similar to what you were describing your system to operate under. Well, in terms of this part of the specification, the use of the term periodic, which is cited occasionally by net currents, doesn't change the fact that the invention, first of all, that the term real-time is in the claims, which specifically, we think, connotes seconds or minutes. It doesn't change the fact that the purpose of this invention was to avoid stock manipulation and rumors, which would not, in practical terms, be accomplished by waiting hours or days. Basically, people with skill in the art reading this invention and reading the claims and the specification in its totality would, I think, interpret it to be something that required a lot greater speed. Although this portion that I quoted is in the paragraph in the summary of the invention section and properly should be looked at as a representation of what the invention is in its broadest context, not necessarily in any specific application or specific use, but in its broadest context. So, again, it would seem to suggest that an instantaneous examination is not necessarily required to accomplish the overall broad goals of this invention. Well, I think that in terms of looking at the abstract, again, the term abstract uses the phrase of fast internet real-time search technology system in addition to the reference that Your Honor quoted. And I think that's, you know, you have to obviously consider the fact that real-time is specifically mentioned separate and apart. The real definition, I mean, I think Your Honor's question to opposing counsel really put your finger on what is, I think, a more meaningful definitional sentence relating to real-time, which is in talking about real-time in column three, this specification talks about operating really at the limits of the computing capacity. And that's really what this invention is about. The statements of the inventor that are in the record, that are undisputed, also point this out. That what was contemplated was operating a computer as fast as you could because this was going to find out if someone was putting untrue statements about a company on the web. And you needed to inform people quickly. A day, the stock price of a company could have tanked by then. I mean, the stock market would stop trading long before you'd ever be able to take corrective measures. And so if stock manipulation is your purpose, then the statement in column three really points out you've got to run the computer very fast. And I think that's what Your Honor's earlier question pointed out. I'll address. Thank you very much. Thank you, Mr. Boyd. Mr. Lee, you have three minutes. Judge Plager asked whether the accused system could continuously access and update the information. And the record in this case that we submitted to the district court indicates that not only could, but it does and it has. That's the fact that it could is really irrelevant, isn't it? Well, I think it does and it has. The accused system is the system that is operationally involved. That's right. So the question is, does it? And it does. And Joint Appendix 610 talks about the fact that for De Factiva, it continuously crawls hundreds of websites. These are the 750 most important websites to their commercial appeal for the system. And again, Appendix 818 talks about monitoring the news around the clock for approximately 750 websites, continuously sending information that you set up. Appendix 930, which was before the district court, says information is made available to the users as it becomes available. Mr. Cahill, Dow Jones employee who worked on the project, we submitted as Joint Appendix 940 said, information adding is done around the clock. And regardless of which way that this court comes out on the construction of real time, we submit that there are fact issues here that have to go to jury on this issue. Now, I do want to talk briefly about the issue that you raised about tracking. One of the second legal error we submit in this case is that district court assumed, and in fact construed that all of the claims are limited to a system where the computer system, accused system has sent something out and that program or bot or crawler has to go out to a third party website. And not only do they bring in the new and added information back, but they have to do the searching over there at the remote sites. And if you were to look at column four, line 14 through 20 of the both patents, in fact the 041 patents, there are two embodiments disclosed. There's one embodiment where information is first brought back to the accused system and then data is examined right there. And in fact, those are the claims that are set forth in the asserted claims. Those are steps 31 and 33 of figure three, as we pointed out in our brief. And those are the separate steps for 141 patent steps B and C. So it's clearly that the district court's ruling on that issue really collapsed those two functions or those two steps and then assumed that both steps have to be taking place at the remote sites. When, in fact, the clear language of the claim does exactly the opposite. I see that my time has run out unless the court has a question. I have no questions. Thank you, Mr. Lee. The case is submitted. Thank you, Your Honor. All rise.